**EDUCATIONAL EQUALITY LEAGUE et al.**

v.

**Honorable James H. J. TATE et al.**

**Civ. A. No. 71–1938.**

United States District Court,
E. D. Pennsylvania.

Nov. 8, 1971.

Edwin D. Wolf, Philadelphia, Pa., for plaintiffs.

John Mattioni, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

BRODERICK, District Judge.

This class action was brought by the Educational Equality League and certain named individuals on behalf of themselves and all others similarly situated in Philadelphia, seeking injunctive and other relief to prohibit the defendant, Mayor of Philadelphia, James H. J. Tate, from continuing his alleged racial discrimination in making appointments to the Educational Nominating Panel, which nominates members to the Philadelphia School Board.

After a hearing on the merits on August 25th and September 7, 1971, and a complete study of the applicable law and the briefs of the parties, we make the following:

### FINDINGS OF FACT

1. It is stipulated that the population of the City of Philadelphia is 1,948,609, of whom 653,791 are black.

2. In the 1970–1971 school year, the public school population of the City of Philadelphia was 60.5% black.

3. In the 1970–1971 school year, the public elementary school population of Philadelphia was 60.2% black.

4. In the 1970–1971 school year, the public junior high school and middle school population of Philadelphia was 65% black.

5. In the 1970–1971 school year, the public senior high school population of Philadelphia was 56.2% black.

6. In the 1970–1971 school year, the public vocational school population of Philadelphia was 59.9%.

7. In 1968–69, 42%, or 116 of the 279 schools in the public school system, had enrollments of over 95% black or over 95% white; In 1970–71, 49%, or 139, of the schools had over 95% one-race enrollments.

8. In 1968–69, 90,105 black students, 54.1% of said students, were in schools with over 95% black enrollment; in 1970–71 the number had increased to 96,014, or 56.7%.

9. The Educational Nominating Panel was set up by the Educational Supplement to the Home Rule Charter, for the purpose of screening applications for school board appointments and nominating three individuals for each vacancy on the School Board for the Mayor's consideration.

10. The Educational Nominating Panel consists of 13 members, 9 of whom are appointed to fulfill certain classifications set out in the Section 12–206 of the Educational Supplement and four (4) are at-large appointments.

11. In 1965 the first panel was appointed with ten (10) white and three (3) black members.

12. In 1967 the second panel was appointed with eleven (11) white and two (2) black members.

13. In 1969 the third panel was appointed with twelve (12) white and one (1) black members.

14. In 1971 the fourth panel was appointed with eleven (11) white and two (2) black members.

15. The first list of nominees submitted to the Mayor in 1971 consisted of five (5) whites and four (4) blacks for the three (3) vacancies on the school board.

16. There are several organizations reflecting the views and participation of the black community which could qualify under subsections 1, 2, 3, 4, 5, 6 and 9 of Section 12–206(b). (7 of the 9 enumerated classes.)

17. The person assigned by the Mayor of Philadelphia to choose the groups under the enumerated categories, Deputy Mayor Anthony Zecca, at the time of the hearing in the instant case was unaware of the existence of many of these black organizations.

18. Of fifty-six appointments to non-civil service positions with salaries in excess of $20,000 who are presently serving, five of these, or 9% of the total, were black.

19. The Mayor has made three hundred eighty eight (388) appointments to Boards, Authorities and Commissions, who are presently serving, of whom forty-seven (47), or twelve (12) percent were black.

20. The Board of Education has two (2) blacks of the total membership of nine (9), or twenty-two (22) percent.

21. Although the Charter provides that the chief executive of the organizations enumerated in § 12–206(b) of the Educational Supplement be appointed to the panel, persons other than chief executives have been appointed.

## DISCUSSION

Plaintiffs brought this class action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief to end alleged racial discrimination in the appointment of members to the Educational Nominating Panel pursuant to the provisions of the Educational Supplement of the Philadelphia Home Rule Charter (hereinafter referred to as the Educational Supplement). More specifically, plaintiffs allege violations of the Equal Protection Clause of the Fourteenth Amendment, the Pennsylvania Human Relations Act, and the express provisions and intended purpose of the Educational Supplement, in that Mayor Tate systematically excluded Negroes from said Educational Nominating Panel.

Preliminary to reaching the merits of plaintiffs' claim, we must first ascertain whether plaintiffs should be certified as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

It is clear that a class consisting of all blacks in the City of Philadelphia meets all the requirements of Rule 23(a) in that: "(1) the class is so numerous that joinder of all members is impracticable"; (2) there is a complete identity on all issues of law and facts; (3) the claims of the representative parties are identical to other members of the class; and (4) there is competent representation by the parties bringing the suit. Moreover, the class clearly falls within the purview of Rule 23(b) (2), because it alleges that defendant has acted on grounds which affect all members of the class. Therefore, it is clear that the class must be confirmed.

The Educational Nominating Panel is a thirteen-member body appointed by the Mayor to screen applicants for membership on the school board and nominate three candidates for each current vacancy on the school board (Section 12–207(b) of the Educational Supplement). Nine (9) members of said Panel are required by Section 12–206(b) of the Educational Supplement to be the highest ranking officer of an enumerated city-wide organization or institution described in detail in that section with the remaining four (4) appointees chosen by the Mayor from the citizenry at large to ensure adequate representation of the entire community (Section 12–206(c)).

In deciding whether, in fact, racial discrimination was practiced in Mayor Tate's nominations to the panel plaintiffs ask us to hold that a prima facie case of discrimination can be made out by a mere showing that blacks comprise a substantial portion of the population, that some blacks are qualified to serve, and that few if any blacks have served in the past. In urging this result plaintiffs rely on cases such as Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L. Ed. 866 (1954), United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 (5th Cir. 1969), and Alabama v. United States, 304 F.2d 583 (5th Cir.), aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). This Court recognizes that this general rule has been applied in certain types of cases. As was clearly stated by the Fifth Circuit in United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966); aff'd on rehearing en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied *sub nom.*, Board of Education of City of Bessemer v. United States, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967):

> This Court has frequently relied on percentages in jury exclusion cases. Where the percentage of Negroes on the jury and jury venires is disproportionately low compared with the Negro population of a county, a prima facie case is made for deliberate discrimination against Negroes. Percentages have been used in other civil rights cases. A similar inference may be drawn in school desegregation cases, when the number of Negroes attending school with white children is manifestly out of line with the ratio of Negro school children to white school children in public schools. *Id.*, 372 F.2d at 887.

However, this rule has been confined to voting rights, employment, school desegregation and jury cases. *E.g.*, Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) (juries); Alabama v. United States, *supra* (voting); United States v. Greenwood Municipal Separate School District, *supra* (schools); United States by Mitchell v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969) (employment).[1] No case has been called

---

1. One case, Turner v. Fouche, *infra*, has applied the percentage rationale to a school board. However, that case is clearly distinguishable from the instant case. In *Turner* the body which appointed the school board was a grand jury, which should have been constituted from all eligible members of the community. The absence of an appropriate number of blacks on the grand jury raised the presumption of discrimination. Thus, in essence, *Turner* was a grand jury case. In the instant case, 9 of the appointments were limited by law and all citizens are not eligible. Moreover, unlike the situation in *Turner*, the Educational Nominating

to our attention in which this rule has been applied to an elected chief executive in the exercise of his discretionary appointive power. We have reservations as to whether the Courts have the authority to exercise control over the chief executive in such circumstances; however, we need not decide this question since the facts presented in the instant case render use of this test unfeasible.

◼ It is undisputed that sixty (60) percent of the Philadelphia Public School Population and thirty-three (33) percent of the Philadelphia population is black. Plaintiffs contend that the 60% figure should be used in determining whether there has been discrimination in appointments to the panel. With this reasoning, we do not concur. The standard when using a percentage rationale to establish a prima facie case of discrimination has always been the number of blacks qualified to fill the jobs in which the alleged discrimination is taking place. *E.g.,* Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Hernandez v. Texas, *supra.* In the instant case that figure would depend on the adult population of Philadelphia, which is approximately 33%.

Mayor Tate's appointments to the Panel include two blacks out of the thirteen appointees, or approximately fifteen point four (15.4) percent of the panel. In its six-year history, the panel has had from 1 to 3 blacks (8% to 23%). With only thirteen members on the Educational Nominating Panel, the addition or subtraction of one member of any ethnic or racial group results in a change of eight (8) percent in that group's representation. In this Court's opinion, such wide fluctuations based on small numerical changes in membership on the Panel result from the limited size of the Panel and render such statistics meaningless as an indicator of racial discrimination. Furthermore, in the

cases wherein the percentage rationale has been adopted, there were a large number of blacks within the population eligible for a large number of positions. This is not the situation in the instant case where a small board is involved, and we cannot find that the absence of additional blacks from a thirteen-member panel proves discrimination.

◼ Plaintiffs rely heavily on the fact that only 8.9% (5 of 56) of Mayor Tate's appointments for positions with salaries in excess of $20,000 have been black. Plaintiffs admit that this fact has no direct bearing on the issues before us, but state that it is relevant to show a pattern of discrimination. However, no case has been presented to us, nor does our research disclose any case, in which a percentage rationale has been used to prove job discrimination without a finding that those allegedly being excluded could qualify for those jobs in roughly the same ratio as they appear in the population. Since no evidence was presented, we cannot assume the percentage who could qualify for such positions. Therefore, the aforesaid statistic is not meaningful, and we do not have to determine whether it is relevant in making a determination on the issue of racial discrimination.

◼ Since the facts of the instant case do not lend themselves to the percentage rationale, plaintiffs must show discrimination by direct proof. The only direct proof offered by the plaintiffs was a newspaper article allegedly quoting Mayor Tate to the effect that he would not appoint any more blacks to the Board of Education. However, since said newspaper article is inadmissible hearsay, there is no direct proof of discrimination in this record.

◼◼ Further, plaintiffs would have us construe Section 12–206(c) of the Educational Supplement to hold that the phrase "representative of the community" refers to racial balance. However,

Panel does not have the authority to appoint Board members but rather only has the authority to submit names to the

Mayor. Thus, *Turner* is not controlling in this case.

the interpretation of this statute would more properly be decided by the State courts, and we take no position thereto. Similarly, while it is clear that the Mayor has not appointed the chief executive officer of the various organizations selected for representation on the Panel as required by the Educational Supplement, such violations have no bearing on the charges of racial discrimination and should also be decided by the State courts.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this case under 28 U.S.C. 1343(3).

2. This action is properly maintainable as a class action on behalf of black students and parents, on behalf of black organizations which qualify for membership on the Educational Nominating Panel, and on behalf of all black citizens of Philadelphia.

3. The fact that there have been alleged violations of the Charter in appointments to the Educational Nominating Panel, such as the failure to appoint chief executives of organizations to the Panel and failing to appoint at-large members to adequately represent the entire community, are not relevant in determining whether racial discrimination was involved with the appointments and such issues should be litigated in the State courts.

4. In the context of the facts found by this Court, the percentage rationale cannot be used to establish a prima facie case of racial discrimination by defendant in violation of the Fourteenth Amendment in the appointment of members to the Educational Nominating Panel.

5. The plaintiffs failed to prove that the Educational Nominating Panel was appointed in violation of the Fourteenth Amendment to the Constitution of the United States.

6. Plaintiffs' complaint is, therefore, dismissed with prejudice.